Filed 6/27/13  Marriage of Goldfarb and Yelton CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re the Marriage of NORMAN GOLDFARB and MELANIE YELTON. | |
| NORMAN GOLDFARB,<br><br>          Appellant,<br><br>v.<br><br>MELANIE YELTON,<br><br>          Appellant. | A130249<br><br>(San Mateo County<br>Super. Ct. No. F072566) |

Norman Goldfarb and Melanie Yelton separated in 1999.  In October 2002, Goldfarb petitioned the San Mateo County Superior Court for a dissolution of their marriage.  The parties stipulated to the appointment of a pro tem judge.  A bench trial was subsequently conducted, including regarding the apportionment between them of certain assets, real property, and personal property, and related claims of reimbursement.  The court issued a statement of decision in April 2010 resolving these issues and a judgment in September 2010.

Goldfarb appeals and Yelton cross-appeals from this judgment.  The issues before us are regarding the trial court's decision to apportion to the community most of the $3,050,715 of proceeds from Goldfarb's sale during the marriage of "founder's" stock he acquired before the marriage, rather than to Goldfarb as his separate property, and related issues about the characterization of certain real properties and assets, the court's decision

1

to award Yelton $0.00 in spousal support, and the parties' disputes regarding certain reimbursement claims. We affirm the judgment in its entirety.

## DISCUSSION

### I. *Timeliness of Goldfarb's Appeal*

As a preliminary matter, Yelton argues Goldfarb's appeal was untimely and should be dismissed because he did not timely appeal from the date the statement of decision was served. We disagree.

Goldfarb filed his notice of appeal on November 4, 2010, from the judgment entered by the court and mail-served on September 8, 2010. Thus, the appeal from the judgment was timely pursuant to California Rules of Court, rule 8.104(a)(1.)[1]

According to Yelton, Goldfarb was required to file his notice of appeal 60 days from April 12, 2010, the date the court filed and served its statement of decision, because the decision was in effect a final judgment. Yelton cites *Estate of Lock* (1981) 122 Cal.App.3d 892, 896 as legal authority for her position.

Yelton is incorrect. As Goldfarb points out our Supreme Court has made clear in *Alan v. American Honda Motor Co., Inc.* (2007) 40 Cal.4th 894, after noting that *Estate of Lock* may apply "when a statement of decision is signed and filed and does, in fact, constitute the court's final decision on the merits," that "[a] statement of decision is not treated as appealable when a formal order or judgment does follow[.]" (*Alan v. American Honda Motor Co., Inc.*, *supra*, 40 Cal.4th at p. 901.) Therefore, Yelton's untimely appeal argument lacks merit.

---

[1] According to the California Rules of Court, "a notice of appeal must be filed on or before the earliest of: [¶] (A) 60 days after the superior court clerk serves on the party filing the notice of appeal a document entitled 'Notice of Entry' of judgment or a file-stamped copy of the judgment, showing the date either was served; [¶] (B) 60 days after the party filing the notice of appeal serves or is served by a party with a document entitled 'Notice of Entry' of judgment or a file-stamped copy of the judgment, accompanied by proof of service; or [¶] (C) 180 days after entry of judgment." (Cal. Rules of Court, rule 8.104(a)(1).)

**II.** *The Court's Use of Pereira to Apportion the Founder's Stock Proceeds*

Goldfarb first argues that the trial court abused its discretion when it apportioned to the community $2,775,330 of the $3,050,715 in proceeds he received during the marriage from his sale of founder's stock in Calgene, Inc. (Calgene), a company he co-founded before the marriage, pursuant to the approach first outlined in *Pereira v. Pereira* (1909) 156 Cal. 1 (*Pereira*), rather than apportion the majority of these proceeds to him as his separate property pursuant to the approach first outlined in *Van Camp v. Van Camp* (1921) 53 Cal.App. 17 (*Van Camp*). We conclude the trial court did not abuse its discretion by doing so.

**A.** *Relevant Evidence*

The parties do not dispute the trial court's summary of the general background of the parties in its statement of decision. The parties were married in February 1982. They have two children, one who was attending college and another, age 17, who was attending private school. Goldfarb graduated from Yale University and has an MBA from Stanford University. Yelton has a BS, MS, and PhD. in microbiology. The parties met while Yelton was studying at the University of California at Davis for her PhD. The court determined that the parties' date of separation was June 6, 1999.

The record indicates that in November 1980, Goldfarb co-founded Calgene, an agricultural biotechnology company, with Dr. Raymond Valentine, a professor at the University of California at Davis with whom Yelton studied, and purchased 400,000 shares of common stock for $4,000.[2]

**1.** *Goldfarb's Co-Founding and Management of Calgene*

At Calgene's founding and for some years thereafter, Goldfarb served as the company's president, chief executive officer (CEO), and chairman of its board of directors. According to Goldfarb, he was initially responsible for Calgene's management, but over time other people assisted and/or replaced him, and a scientific

---

[2] Goldfarb also acquired, and later sold, additional shares of stock through his family's investment company. These matters are not at issue in this appeal and will not be further discussed.

3

advisory board was established that had primary responsibility for managing the scientific aspects of the company, which were most of its aspects.

Goldfarb testified that it was primarily his decision that, from the beginning, Calgene would focus on developing engineered plants and plant products and seeds, and conducting research and development in that area. Goldfarb testified that Calgene had offices by the summer of 1981, when it opened laboratories. As of June 1981, Calgene had 10 to 20 employees, and had approximately 20 employees as of February 1982, the date of the marriage. Initially Calgene started developing technology that could be applied to develop products, and subsidized this work as early as possible with revenue from contracts with other companies. Its prospects improved prior to the date of the marriage because of an investment in the company (via a purchase of stock) by Continental Grain and Allied Chemical. According to Goldfarb, whereas Allied Chemical's investment had the "normal trappings" of a strategic investment, Continental Grain's did not. Goldfarb testified that later, in 1984, "there was series D financing with a number of investors, including the Goldfarb Partnership . . . , and then there were series, there was subsequent series after that," the details of which he did not recall.

Goldfarb testified that the company grew substantially after the date of the marriage. By the time of its initial public offering (IPO) in July 1986, it had approximately 96 employees. However, Goldfarb said that the company did not make a profit through December 1984 and, while it may have had a profitable quarter in 1985, did not make a profit that year either. It was not until 1984 or 1985 that it developed a product, improved cotton seeds, that went to market, and it was very successful.

Indeed, Goldfarb contended that he was not responsible for the company's ultimate success. While for five of six years, he worked more than five days a week at Calgene, his responsibilities gradually decreased. He testified that he was "far from" being the sole cause of the company's success; to the contrary, he said, "[u]nder my leadership, it was quickly going into the ground."

Goldfarb also testified that much of the company's success was due to another person, Roger Salquist. In 1981, Salquist joined Calgene's board of directors. Goldfarb

4

testified that he always intended that Salquist succeed him as part of Goldfarb's long-term plan of succession because Goldfarb knew he would leave Davis after Yelton completed her graduate studies. Salquist, who had more extensive business background and relevant expertise than Goldfarb, was to join Calgene's management when he could. The record indicates that Salquist became the vice president of marketing and sales for Calgene in 1983, succeeded Goldfarb as Calgene's president in June 1984, and succeeded Goldfarb as Calgene's CEO at the end of 1985. Goldfarb was then left to serve in one position, as Calgene's chairman of the board of directors, which position he left in 1986.

According to Goldfarb, Salquist was the proponent and implementer of a change in Calgene's business plan. Instead of building businesses from scratch, Calgene would acquire existing business in which its technology could be used to develop products that those companies could then sell. However, Goldfarb testified, "I was certainly engaged in discussion, and the decision would have required my approval, given my role in the company." This decision was "probably" made in 1984. He also testified that the strategy advocated by Salquist "may have been" a part of the original plan that initiated the start-up of Calgene.

Asked about his specific responsibilities from 1983 to 1984, Goldfarb said that he was "gradually relinquishing" his responsibilities to Salquist during that time. He "focused" his time on working with government to manage the regulatory issues Calgene faced and an unsuccessful attempt to establish an operation in Europe. He thought his work with government was successful, but it was with a "very large group of other industry people." By the period from 1984 to 1985, he had given up his membership on Calgene's executive committee as well.

Goldfarb acknowledged, that as of April 1986, he was listed in a document entitled "Management Executive Officers and Directors" as a highly compensated executive officer, although he was only chairman of the board at that time. During his time at Calgene, he was always the highest compensated officer or director (the record indicates he was paid $92,000 in 1985), and had the largest ownership interest in the company. Indeed, the court found that Goldfarb had a controlling interest, with which

5

Goldfarb does not disagree on in his appellate briefing.  Nonetheless, according to Goldfarb, a document prepared by underwriters at the time of the 1986 IPO, by listing him sixth, indicated he was the sixth most important person in the company.

As we have discussed, Calgene became a publicly traded company in July 1986.  By 1988, Goldfarb sold all of his founder's common stock, at an average price of $9.82 per share, netting $3,050,715 from the sale.

**2.**  *Michael Thompson's Testimony Regarding Goldfarb's Role at Calgene*

Goldfarb presented expert opinion testimony, largely via a declaration that was admitted into evidence, about his role in Calgene from Michael Thompson, an expert qualified to testify regarding any forensic accounting issues relevant to the case.

According to Thompson, Calgene's July 1986 IPO Prospectus (prospectus) indicated that Valentine recruited Calgene's scientific advisory board in 1981, and this was the primary attraction for the initial scientists to join Calgene.  However, the prospectus pages cited by Thompson do not establish these points.

Also according to Thompson, investors in Calgene did not see Goldfarb as the "primary attraction, and probably expected to replace him with a more mature executive.  He was 27-32 years old and had no senior management, entrepreneurial, scientific or agricultural experience, track-record or industry contracts.  They invested in the reputations of Dr. Valentine and the Scientific Advisory Board members, plus the scientific accomplishments of the research team.  Later, they also saw value in the management team and corporate partnerships."  Thompson did not identify any sources of information for these opinions.

Thompson also stated that Goldfarb relinquished his CEO title in 1984, although the prospectus page he cites states that Goldfarb did so at the end of 1985.  Thompson opined that Salquist "was the central figure in the company" with primary credit for obtaining certain financing and making the "company profitable operating after Goldfarb resigned from the company," but, again, he either provides no citations to evidence supporting this opinion or cites to a prospectus page that does not support it.

6

Based on his valuation of Goldfarb's founder's stock as of the time of the marriage, a subject we discuss further in subpart III, *post*, Thompson concluded that under either the *Pereira* or *Van Camp* approach, Goldfarb was entitled to all of the proceeds of his sale of Calgene stock as his separate property.

Thompson also opined, in a letter that was an exhibit to his declaration and in his testimony, that in his opinion the *Van Camp*, rather than the *Pereira*, apportionment method should be used because of the nature of Calgene's business, which was largely scientific, the fact that Goldfarb had no scientific skills and did no scientific work, and that "[h]is management, sales, finance, management, and other relevant experience was also very limited."

Thompson also opined that Goldfarb received an adequate salary from Calgene, "for which another non-stockholder employee with equal skills and background could have been hired." He noted that Goldfarb was the highest paid employee at the company.

### 3. *Dana Grigg's Testimony*

Yelton presented the expert testimony of Dana Grigg. The court found that Grigg did not offer much of any opinion about the adequacy of Goldfarb's compensation, contributing to the court's decision to appoint its own expert, which we discuss directly below. The court also rejected Grigg's testimony that the purchase price for Calgene stock in Goldfarb's name came approximately 12 percent from separate funds and 85 percent from community funds because Grigg did not introduce sufficient evidence to support his opinion.

### 4. *Sally White's Testimony Regarding Goldfarb's Role at Calgene*

Following the close of evidence, including expert testimony, the court appointed its own expert, Sally White, pursuant to Evidence Code 730[3] to review certain issues

---

[3] Evidence Code section 730 states in relevant part, "When it appears to the court, at any time before or during the trial of an action, that expert evidence is or may be required by the court or by any party to the action, the court on its own motion or on motion of any party may appoint one or more experts to investigate, to render a report as may be ordered by the court, and to testify as an expert at the trial of the action relative to

disputed between the parties and report to the court regarding them. In the course of making this appointment, the court indicated that it viewed the case thus far as "more of a *Van Camp* apportionment case than a *Pereira* (although not solely)," that there could be a community interest in the Calgene founder's stock proceeds, and that the court needed assistance from its own expert to review Thompson's materials.

White subsequently provided a September 2008 report to the court and testified at a hearing. She stated she had insufficient evidence to make certain determinations, and that Thompson's analysis was insufficient or inapplicable. The court reopened trial based on its instruction to White to expand her report to the court by reviewing all records available to the experts on both sides, and instructed White to perform a compensation survey regarding Goldfarb's compensation at Calgene. White subsequently submitted a May 2009 report to the court and testified.

White testified that she thought the *Pereira*, rather than the *Van Camp* approach, was more applicable to the apportionment of the proceeds of Goldfarb's sale of his Calgene stock. She based this opinion on the many ways she thought Goldfarb had contributed to Calgene's success. These included that he was the founder of the company, worked there, invested his own and his family's money, successfully recruited outside investors, and was an integral part of the company as president and chairman of the board.

Regarding Goldfarb's compensation during the marriage for his services at Calgene, White opined that, were the court to apply the *Van Camp* approach, the community had been undercompensated in the amount of $165,493, which, with a conservative rate of return applied, yielded a return on investment of $307,760; the total present value of undercompensation, therefore, was $473,253.

### 5. *The Court's Ruling*

In its statement of decision, the trial court adopted White's recommendation that the *Pereira* apportionment approach be applied. The court stated: "Unlike the *Van*

the fact or matter as to which the expert evidence is or may be required." (Evid. Code, § 730.) Further unspecified code sections refer to the Evidence Code.

*Camp* case, Calgene was not fully operational at the date of marriage and numerous rounds of financing had to take place to make the company survive and successful. [Goldfarb] was instrumental in each financing. Further, [Goldfarb] was one of only two founders, he knew enough to start the company, invest in it and loan it money. He understood the company and knew to get Continental Grain, Allied Chemical and others to invest in the company. As found by White, he was under compensated during the marriage, he was President and/or Chairman of the Board. He had a controlling interest in the company and he was the highest paid employee. Because of all this, he (and the community) had a serious and major impact on the company's success by his efforts during marriage."

The court also adopted White's valuation of Goldfarb's founder's stock at $0.39 at the date of the marriage. It applied a 10-year Treasury bond yield and concluded that the value of the stock on the date of sale was $275,385. Applying *Pereira*, the court concluded that the community interest in the proceeds of Goldfarb's sale of his founder's stock was $2,775,330.

**B. *Relevant Legal Standards***

In *Patrick v. Alacer Corp*. (2011) 201 Cal.App.4th 1326 (*Patrick*), the court, quoting from *Marriage of Dekker* (1993) 17 Cal.App.4th 842 (*Dekker*), provided a concise summary of the legal standards we apply in the present case, including the differences between the *Pereira* and *Van Camp* apportionment methods. The *Patrick* court stated:

" '[I]n California, property acquired prior to marriage is separate, while property acquired during the marriage is presumed community property. [Citations.] Income from separate property is separate, the intrinsic increase of separate property is separate, but the fruits of the community's expenditures of time, talent, and labor are community property.' ([*Dekker*, *supra*, 17 Cal.App.4th at p. 850].)

" 'Where community efforts increase the value of a separate property business, it becomes necessary to quantify the contributions of the separate capital and community effort to the increase.' (*Dekker*, *supra*, 17 Cal.App.4th at p. 851.) '[T]he necessity of

9

apportionment arises when, during marriage, more than minimal community effort is devoted to a separate property business. [Citations.] [¶] The community is entitled to the increase in profits attributable to community endeavor. [Citations.] Accordingly, courts must apportion profits derived from community effort to the community, and profits derived from separate capital are apportioned to separate property.' (*Id.* at pp. 851–852, fns. omitted.)

" 'Appellate review of a trial court's finding that a particular item is separate or community property is limited to a determination of whether any substantial evidence supports the finding. [Citations.] We apply the substantial evidence test . . . to the issue whether equitable apportionment should be applied . . . .' (*Dekker*, *supra*, 17 Cal.App.4th at p. 849.)

" 'Once the court is satisfied that it should apportion business profits, the question arises which method to apply. California courts have developed two alternative approaches to allocating business profits. The *Pereira* approach is to allocate a fair return to the separate property investment and allocate the balance of the increased value to community property as arising from community efforts. [Citations.] The *Van Camp* approach is to determine the reasonable value of the community's services, allocate that amount to community property and the balance to separate property.' (*Dekker*, *supra*, 17 Cal.App.4th at pp. 852–853, fns. omitted.)

" '[C]ourts have not developed a precise standard in choosing between *Pereira* or *Van Camp*, but have endeavored to adopt that formula which is most appropriate and equitable under the circumstances. [Citation.] The court is not bound to adopt a predetermined percentage as a fair return on separate business capital, nor need it limit the community interest to a salary as reward for a spouse's efforts, but may select whichever formula will effect substantial justice between the parties. [Citation.] [¶] *Pereira* is typically applied where business profits are principally attributed to efforts of the community. [Citations.] Conversely, *Van Camp* is applied where community effort is more than minimally involved in a separate business, yet the business profits accrued are attributed to the character of the separate asset. [Citations.] The court has discretion

10

to choose whichever formula will effect substantial justice.' (*Dekker*, *supra*, 17 Cal.App.4th at p. 853.) Thus, '[w]e apply the abuse of discretion test to the court's application of *Pereira*.' (*Id*. at p. 849.)" (*Patrick*, *supra*, 201 Cal.App.4th at pp. 1339-1340.)

Courts have considerable discretion in determining how to apportion community and separate property in circumstances such as those in the present case. Our Supreme Court has made clear that, as indicated in *Patrick*, a court is not bound to choose either the *Pereira* or *Van Camp* apportionment method. " 'In making such apportionment between separate and community property our courts have developed no precise criterion or fixed standard, but have endeavored to adopt that yardstick which is most appropriate and equitable in a particular situation . . . depending on whether the character of the capital investment in the separate property or the personal activity, ability, and capacity of the spouse is the chief contributing factor in the realization of income and profits [citations] . . . . [¶] In applying this principle of apportionment the court is not bound either to adopt a predetermined percentage as a fair return on business capital which is separate property [the *Pereira* approach] nor need it limit the community interest only to [a] salary fixed as the reward for a spouse's service [the *Van Camp* method] but may select [whichever] formula will achieve substantial justice between the parties.' " (*Beam v. Bank of America* (1971) 6 Cal.3d 12, 18 (*Beam*).)

The test for abuse of discretion "is whether or not the trial court exceeded the bounds of reason, all of the circumstances before it being considered." (*In re Marriage of Connolly* (1979) 23 Cal.3d 590, 598.) " 'Substantial evidence' is evidence of ponderable legal significance, evidence that is reasonable, credible and of solid value. [Citations.] 'Substantial evidence . . . is not synonymous with "any" evidence.' Instead, it is ' " 'substantial' proof of the essentials which the law requires." ' [Citations.] The focus is on the quality, rather than the quantity, of the evidence. 'Very little solid evidence may be "substantial," while a lot of extremely weak evidence might be "insubstantial." ' [Citation.] Inferences may constitute substantial evidence, but they must be the product of logic and reason. Speculation or conjecture alone is not

11

substantial evidence. [Citations.] Expert opinion testimony constitutes substantial evidence only if based on conclusions or assumptions supported by evidence in the record. Opinion testimony which is conjectural or speculative 'cannot rise to the dignity of substantial evidence.' " (*Roddenberry v. Roddenberry* (1996) 44 Cal.App.4th 634, 651.)

## C. *Analysis*

Goldfarb argues that the trial court abused its discretion when it applied the *Pereira* method to apportion the proceeds of his Calgene stock sale between community and separate property because there was not a "scintilla" of evidence to support that application. Instead, the court should have applied the *Van Camp* method because the only evidence in the record indicates Goldfarb's effort during the marriage was not the principal reason for the company's growth and the resulting profit, and the value of Goldfarb's services during the marriage, even if an adjustment were made pursuant to White's opinion that he had been undercompensated, was the proper measure of community allocation. Yelton disagrees, as do we. The court's application of the *Pereira* method was not unreasonable and its determinations were supported by ample evidence that Goldfarb had a serious and major impact on Calgene's success during the marriage; indeed, we conclude the evidence supports the conclusion that he was the "chief contributing factor" in Calgene's success. (*Beam*, *supra*, 6 Cal.3d at p. 18.)

Goldfarb's argument suffers from two fatal flaws. First, his argument in effect presumes that the trial court could only apply the *Pereira* method if Goldfarb was "principally" responsible for Calgene's growth after the marriage, which Goldfarb interprets as essentially requiring that Goldfarb be virtually solely responsible for this growth. Goldfarb takes this language from the statement in *Dekker* that "*Pereira* is typically applied where business profits are principally attributed to efforts of the community." (*Dekker*, *supra*, 17 Cal.App.4th at p. 853.) The *Dekker* court was not necessarily incorrect in noting that the *Pereira* method is "typically" applied when business profits are "principally" the result of community efforts (*Dekker*, *supra*, at p. 853), such as the efforts of a spouse in a pre-existing business during the marriage.

12

However, nothing in *Dekker*, or any of the other case law discussed by Goldfarb, indicates that the *Pereira* method cannot be applied when others are also involved in the business efforts that lead to success. As we have discussed, and as Goldfarb acknowledges in his opening brief, " '[i]n making such apportionment between separate and community property our courts have developed no precise criterion or fixed standard, but have endeavored to adopt that yardstick which is most appropriate and equitable in a particular situation," is not bound to adopt the *Pereira* or *Van Camp* method, and " 'may select [whichever] formula will achieve substantial justice between the parties.' " (*Beam*, *supra*, 6 Cal.3d at p. 18.)

Rather, the trial court has "considerable discretion in choosing a method of allocating the separate and community return on a husband's separate holdings." (*In re Marriage of Folb* (1975) 53 Cal.App.3d 862, 873 (*Folb*), disapproved on other grounds in *In re Marriage of Fonstein* (1976) 17 Cal.3d. 738, 749.) As Yelton points out, in *Folb*, the trial court considered how to apportion assets that largely consisted of commercial property the husband had developed. (*Folb*, at pp. 865-866.) The court used the *Pereira* method to determine the annual rate of return on the husband's separate property holdings should be 12 percent, rather than the 14 to 18 percent advocated by the husband. (*Folb*, at pp. 871-872.) It did so "because a portion of [the husband's] community services were devoted to the care, maintenance and development of his separate estate" and, therefore, a " 'fair and reasonable rate of return' " was 12 percent. (*Id*. at p. 872.)

The appellate court, after noting the considerable discretion of the trial court in allocating separate and community interests, rejected the husband's argument that he made little community effort during the relevant time period of the marriage and was, in effect, a passive investor in the commercial property that he owned. (*Folb*, *supra*, 53 Cal.App.3d at p. 873.) The court's analysis indicated that the question was not whether the husband's efforts were "principally" responsible for the profitability accrued during the relevant time period of the marriage, but, rather, whether these efforts were a very significant reason for that profitability, even with the participation of others in the management of the property. The appellate court found that "[t]here was ample

13

evidence . . . that husband was an unusually skillful developer of raw land. He was active in every phase of development either personally or through the efforts, supervised by him, of personnel selected by him, including obtaining necessary financing and supervising actual construction. The trial court specifically found that an element which contributed greatly to his success was his undertaking the function of general contractor with respect to his buildings. He also selected and advised the personnel who rented the commercial space thereafter. It cannot be concluded, therefore, that . . . he simply relied on the fact of his separate investment throughout the marriage to generate capital; on the contrary, the evidence showed that he expended great effort in enhancing that capital. The trial court did not ignore the testimony of his experts concerning the rate of annual return generated by commercial holdings during the period in question; it merely decreased the percentage so generated by assigning a percentage value (probably about 6 percent) to the community investment in husband's separate holdings. The resulting 12 percent, used by the trial court, is amply supported by the record." (*Folb*, *supra*, 53 Cal.App.3d at p. 873.)

The facts of the present case that support the court's conclusion are similar to those in *Folb*. Thus, we conclude that the court was not precluded from applying the *Pereira* method in the present case.

The second fatal flaw in Goldfarb's analysis is that he focuses only on evidence that he contends favors his point of view, while largely ignoring that which favors the court's ruling.[4] Goldfarb argues that the circumstances described in *Van Camp* are very similar to those here, requiring that the *Van Camp* should be applied here. However, as Yelton points out, simply because there are facts that would not make it inappropriate for

---

[4] We do not analyze the evidence referred to by Goldfarb in detail in light of our conclusion that there is ample evidence to support the trial court's decision to apply the *Pereira* method. We note, however, that the evidence is not as strong as Goldfarb contends, given that he relies significantly on assertions of his expert Thompson that, as we have discussed, are not supported by citations to evidence. As Goldfarb notes elsewhere in his opening brief, "expert testimony does not constitute substantial evidence when based on conclusions or assumptions not supported by evidence in the record." (*People ex rel. Brown v. Tri-Union Seafoods, LLC* (2009) 171 Cal.App.4th 1549, 1567.)

14

the trial court to apply the *Van Camp* method does not make it inappropriate for the trial court to apply *Pereira*. Under an abuse of discretion standard, " ' "[w]hen two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." ' " (*In re Jasmine* (2000) 78 Cal.App.4th 1339, 1351.) Thus, the focus of our review should be not on the evidence that supports Goldfarb's position, such as his testimony of his gradual reduction of his management role over time and the increased importance of Salquist, but on whether the court could reasonably conclude there was sufficient evidence to support the application of the *Pereira* method. We conclude that there was ample evidence to support the court's decision.

It was reasonable for the trial court to infer from Goldfarb's testimony that he was in charge of Calgene's management from its inception and for the first two years of his marriage, when he was its president, CEO, and chairman of its board of directors. Goldfarb is critical of the fact that the court's description of Goldfarb's role at Calgene in its statement of decision includes references to some events that occurred prior to the marriage. While prior to the marriage Goldfarb conceived of Calgene's purposes and business strategies, arranged investments via Continental Grain and Allied Chemical, and recruited persons to Calgene, the court could reasonably conclude from Goldfarb's testimony and the record that, during the marriage, he continued to implement these purposes and strategies, including arranging further investment into the company in 1984 (as indicated by The Goldfarb Partnership's participation), and implementing *his own plan*, as president, CEO, and chairman of the board, to gradually transition the company's management to Salquist. Furthermore, Salquist did not join Calgene's management until a year after the marriage, then only as a vice president responsible for marketing, and did not assume CEO responsibilities until the end of 1985, almost three years after the marriage.

Furthermore, Goldfarb acknowledged that for the years he was with Calgene, he worked more than five days a week, held the largest ownership interest in the company and, by the nature of his authority, participated in discussions about, and needed to

15

approve, the strategies Salquist implemented, which Goldfarb said led to the company's success.  He also acknowledged that these strategies may have been a part of the original business plan for Calgene, suggesting that Goldfarb may have had a hand in conceiving of this winning strategy.  Goldfarb also indicated that the company "grew substantially" after the marriage and that he contributed to the company's success with his work regarding government regulation of the company's activities.

Furthermore, there was sufficient evidence for the court to conclude, as it did, that the company was not "fully operational" at the date of the marriage.  White testified that she thought this was the case because Calgene was a startup going through rounds of financing, and was developing relationships, contacts, contracts and its knowledge.  Goldfarb disagrees, asserting that as of the marriage Calgene had conducted third-party sales transactions, established strategic alliances, had revenue, employees, management, a board of directors, a scientific advisory board, a plant and equipment, and public representations that it was open for business.  While this may have been the case, the court's conclusion was supported by evidence that Calgene was by no means a self-sustaining company at this time.  This is indicated by Goldfarb's testimony that Calgene did not actually send a product to market until 1984, did not turn a profit before 1986, and needed to raise money through another round of financing in 1984.

Given this evidence, it was reasonable for the court to infer that during the marriage, Goldfarb acted as a co-founder to implement his vision for the company as chairman of Calgene's Board for almost five years, including through its going public, Calgene's CEO for almost four years, Calgene's president for more than two years, its highest paid officer, and holder of the largest, even controlling, amount of company stock.  In other words, as the court concluded, during the marriage "he had a serious and major impact on the company's success by his efforts."  Indeed, in our view, the evidence was sufficient to establish that he was the "chief contributing factor" in Calgene's success, including during the marriage.  (*Beam*, *supra*, 6 Cal.3d at p. 18.)

16

### III. *Valuation of Goldfarb's Founder's Stock*

Goldfarb also argues that, even if we conclude that the trial court did not abuse its discretion by applying the *Pereira* apportionment method, it erred when it found that the fair market value of Goldfarb's Calgene founder's stock at the date of marriage was $0.39 per share because no substantial evidence supported this valuation. We conclude there was such evidence.

### A. *Relevant Proceedings Below*

Under the *Pereira* method, the court was required to determine the value of Goldfarb's founder's stock at the date of the marriage, allocate a fair return on it, and apportion it as Goldfarb's separate property. The court considered the conflicting expert views on this subject at trial.

Thompson opined that the most valid indicator of the stock's value at the date of the marriage was the December 6, 1981 purchase of Calgene preferred stock by Continental Grain about two months before the marriage. However, as the record indicates and Goldfarb testified, Continental Grain originally paid $1.50 per share for Series B preferred stock on December 16, 1981. Continental Grain subsequently exchanged five of these shares for one share of series C preferred stock. Thompson asserted that, given this five-for-one reverse split, the value of the stock purchased by Continental Grain at the date of marriage was $7.50.[5]

As for the difference between preferred and common stock, Thompson testified that "a company like this [Calgene] is either going to hit a home run, or they're not going to be worth anything. So the distinction between preferred and common really only is a small distinction."

Thompson's valuation was significant because he estimated that, with long-term interest, Goldfarb's founder's stock was worth $5,318,401 at the date of its sale. Since

---

[5] Thompson also referred to a July 1981 purchase of Calgene Series B preferred stock by Allied Chemical at $3.75 per share. He testified that the Continental Grain purchase was a better indicator because it was closer in time to the date of the marriage, but that the Allied Chemical deal made Calgene a more valuable company.

17

this figure was greater than the actual proceeds received by Goldfarb, there would be no community interest in these proceeds, even under the *Pereira* method.

Grigg testified that the use of the Continental Grain stock purchase to determine the fair market value of Goldfarb's founder's stock at the date of marriage was improper because Continental Grain purchased preferred stock, whereas Goldfarb's shares were common stock. Grigg also opined that the Continental Grain transaction was not an arm's length sale because Continental Grain was not a disinterested third party and had "strategic" reasons for making the purchase.

Goldfarb testified that Continental Grain's investment was not strategic.

In her September 2008 report, White, the expert appointed by the court, noted that the 1984 stock purchase was valued at $4.80 a share, significantly less than the $7.50 value Thompson attached to the Continental Grain purchase. She thought that reliance on the Continental Grain deal alone without consideration of the declining value in the stock was not the best indicator of the value of Goldfarb's founder's stock at the date of the marriage. She also thought that there was additional information not provided in Thompson's report, and concluded that, without knowing all the facts supporting each series of stock offering, the value of Goldfarb's founder's stock at the date of the marriage could not be determined. The court instructed White to conduct a further inquiry.

In her subsequent May 2009 report, White concluded that the values of Goldfarb's founder's stock, which was common stock, and the Continental Grain preferred stock were not equal, as the former did not have the voting rights or preferences afforded to the latter. White reported that Calgene's 1981 stock option plan, as discussed in a May 1986 preliminary prospectus, indicated that historically stock options had been granted at much lower exercise prices than the $7.50 asserted by Thompson and Goldfarb, Calgene had

18

considered these exercise prices to be at least equal to fair market value, and stock transactions had occurred at these much lower prices.[6]

Specifically, White quoted the preliminary prospectus as stating, " 'The exercise price of each stock option granted on the Option Plan must be at least equal to the fair market value of the underlying shares on the date of grant and the maximum term of each option is 10 years.' " The preliminary prospectus stated that the options had been granted with exercise prices ranging from $0.39 to $1.53 per option, a range that covered options granted from plan inception in 1981 through May 1986. She reported that options that had been vested and exercised by May 15, 1986, averaged $0.39 per share. White further reported that, according to notes included with the preliminary prospectus, options were exercised at $0.30 a share during the fiscal year ending September 30, 1983, and from $.025 to $0.30 a share during the fiscal year ending September 30, 1984. Also, White reported, in the 1982-1983 fiscal year, Calgene repurchased 50,000 shares of common stock at a price of $0.30 per share.

White concluded, "Based on the information regarding the stock option plan and the repurchase of common stock, it is my opinion that the value of the common stock at or around date of marriage was $0.39 per share." Based on this valuation, White estimated that the total value of Goldfarb's founder's stock at the date of marriage was $156,000. Applying an interest rate equal to the 10-year Treasury bond yield, the value of the stock to be apportioned as Goldfarb's separate property was $275,385.

White also testified about her $0.39 valuation. She said that she supported it because it was based on a comparison with common rather than preferred stock. She looked at information available about the preferred stock transactions and found they had liquidation and dividend preferences, among other things. Based on these differences, she did not think preferred and common stock had the same value because typically more is paid for stock with those preferences. Rather, she concluded that the fair market value

---

[6] White also testified that the May 1986 preliminary prospectus could have been a draft and the July 1986 prospectus the final version, that they were "almost mirror images of each other," and that there were "no material differences" for her purposes.

19

given to stock options at the time they were granted, which options converted to common stock after a vesting period, "more directly correlated with the value of the stock owned by Goldfarb."

White testified that she was aware that Calgene was not making money at the time of the marriage and continued to lose substantial amounts of money for several years thereafter, and took into consideration "the fact that Calgene maybe didn't have any value whatsoever." She gave more weight to the fact that the board of directors at the time determined a value that it considered to be a fair market value; she acknowledged that she did not know how the board reached this figure, however.

Thompson responded to White's report by reasserting that the Continental Grain transaction was clearly the best indicator of the value of Goldfarb's founder's stock. He indicated that, while it was theoretically possible that Goldfarb's stock had a lower value than Continental Grain's preferred shares, it was incorrect to ignore the Continental Grain transaction entirely and not attempt to quantify the value of the supposed preferences given these preferred shares. Thompson listed eight reasons why he considered White's valuation to be flawed. On appeal, Goldfarb emphasizes one of Thompson's stated reasons in particular: that "Calgene's stock option grants were not arms-length transactions between independent, knowledgeable buyers and sellers," since there was no public market for Calgene common shares during the period in question.

Thompson also asserted, after referencing Goldfarb's own testimony, that the statement in the prospectus that the stock options were being priced at "market price or above was *not* truthful; it was common 'boilerplate' used at the time to avoid employee taxable income when options were exercised. Calgene, like similar companies, never obtained third-party appraisals of the value of its shares, in order to give its Board the freedom to price stock options as it saw fit."

Specifically, Goldfarb testified that the stock option prices were set at "the lowest price we could conceivably come up with in order to provide maximum motivation to the employees, as was the custom at that time." Calgene attorneys, he said, subsequently indicated the price was too low, and invited audit by the IRS.

20

In its statement of decision, the trial court noted that the April 1981 stock option plan required that the exercise price of each stock option granted be at least equal to the fair market value of the underlying shares on the date of grant, that options were granted with exercise prices ranging from $0.39 to $1.53 per option, and that $0.39 was the average price of shares that were exercised through May 15, 1986. The court also noted Thompson's response that the stock option analysis by White did not involve an "arms-length" transaction and was not reflective of the real value of the stock, but concluded that Thompson did not "deal with the apparent contradiction" with the Calgene prospectus statement that the option price had to be at least equal to fair market value. It adopted White's recommended valuation of Goldfarb's founder's stock at the date of the marriage was $0.39. The court also adopted White's valuation of the stock on the date of sale under the *Pereira* method. As we have discussed, the court concluded that $2,775,330 of the $3,050,715 in proceeds Goldfarb received from sale of the stock was community property.

**B.** *Analysis*

Goldfarb argues that the trial court improperly adopted White's opinion that Goldfarb's founder's stock was worth $0.39 at the time of marriage because her opinion was not supported by substantial evidence, given that she did not perform any valuation of this stock but instead relied on Calgene's statements in its preliminary prospectus about the company's stock option plan. Goldfarb argues that, as a matter of law, relying on the company's stock option plan was not a "valuation" for purposes of determining the fair market value of stock. We conclude the court's $0.39 valuation was supported by substantial evidence, as reported by White, and, therefore, the court did not err.

"The trial court possesses broad discretion to determine the value of community assets as long as its determination is within the range of the evidence presented. [Citation.] The valuation of a particular asset is a factual question for the trial court, and its determination will be upheld on appeal if supported by substantial evidence in the record. [Citation.] All issues of credibility are for the trier of fact, and all conflicts in the evidence must be resolved in support of the judgment. [Citation.] The trial court's

21

judgment is presumed to be correct on appeal, and all intendments and presumptions are indulged in favor of its correctness." (*In re Marriage of Nichols* (1994) 27 Cal.App.4th 661, 670.)

A definition for fair market value generally accepted in California is " 'the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell' and both have a reasonable knowledge of relevant facts." (*In re Marriage of Hewitson* (1983) 142 Cal.App.3d 874, 882, fn. 8.) That said, "[t]he determination of the value of infrequently sold, unlisted, closely held stock is a difficult legal problem. Most of the cases illustrate there is no one applicable formula that may be properly applied to the myriad factual situations calling for a valuation of closely held stock." (*In re Marriage of Duncan* (2001) 90 Cal.App.4th 617, 632 (*Duncan*).) "In the exercise of its broad discretion, the trial court 'makes an independent determination of value based upon evidence presented on the factors to be considered and the weight given to each. The trial court is not required to accept the opinion of any expert as to the value of an asset.' [Citations.] Rather, the court must determine which of the recognized valuation approaches will most effectively achieve substantial justice between the parties." (*Ibid*.)

Nonetheless, when a trial court has accepted an expert's ultimate conclusion without critical consideration of the reasoning behind it, and it appears the conclusion was based upon improper or unwarranted matters, then the judgment must be reversed for lack of substantial evidence. (*Pacific Gas & Electric Co. v. Zuckerman* (1987) 189 Cal.App.3d 1113, 1135-1136.)

Goldfarb asserts that "[t]o establish a fair market value for close corporation shares, two methods are generally used—one is the 'use of recent sales of the unlisted stock, which were made in good faith and at arm's length, within a reasonable period either before or after the valuation date.' (*In re Marriage of Hewitson* [, (*supra*,)] 142

22

Cal.App.3d [at p.] 882.)"[7] This, he contends, was Thompson's method, and suggests it was the only valuation method that the court should have considered, given White's alternative, which was not based on an independent valuation.

However, Goldfarb does not contend that the preliminary prospectus misstated anything. Instead, Goldfarb ultimately argues that the court could not rely on Calgene's own representation of fair market value in the stock option plan based on Goldfarb's testimony indicating the company set the price as low as possible as an incentive for employees. Goldfarb states, "[Goldfarb] does not dispute the court's general discretion to select one legitimate valuation method over another. But that does not answer the question of whether a particular method is indeed legitimate. If, as [Goldfarb] argues here, the stock option plan was not and did not reflect a fair market valuation, or any valuation at all for that matter, then it was by definition an abuse of discretion for the trial court to indirectly rely on it." There are several problems with his argument.

First, Goldfarb does not cite any legal authority that establishes the court could *not* rely on White's valuation, and the bases for it, i.e., that Calgene represented in the preliminary prospectus that it had granted options with an exercise price "at least equal to the fair market value of the underlying shares on the date of grant"; that the options had been granted with exercise prices ranging from $0.39 to $1.53 per option, a range that covered options granted from plan inception in 1981 through May 1986; that options that had been vested and exercised by May 15, 1986, averaged $0.39 per share; that options were exercised at $0.30 a share during the fiscal year ending September 30, 1983, and from $.025 to $0.30 a share during the fiscal year ending September 30, 1984; and that in the 1982-1983 fiscal year, Calgene repurchased 50,000 shares of common stock at a price of $0.30 per share.

Ultimately, Goldfarb's argument does not present a question of law. We see no reason why the trial court could not rely on an expert valuation based on Calgene's own representation of the fair market value of common stock sold to employees as part of its

---

[7] He also refers to a price-to-earnings methodology, but does not argue for its application in this case.

23

stock option plan and its own history of transactions involving comparable common stock. (See *In re Marriage of Rives* (1982) 130 Cal.App.3d 138, 149-150 [finding improper expert's valuation of a business's goodwill based on potential income rather than historical production and income figures].) " '[T]here is no one applicable formula that may be properly applied to the myriad factual situations calling for a valuation of closely held stock' " (*Duncan*, *supra*, 90 Cal.App.4th at p. 632), and the court "must determine which of the recognized valuation approaches will most effectively achieve substantial justice between the parties." (*Ibid*.) We conclude the court was legally allowed to rely on White's valuation and the underlying reasons for it, given the broad discretion afforded to the court to determine the value of community assets as long as its determinations are within the range of the evidence presented. (*In re Marriage of Nichols*, *supra*, 27 Cal.App.4th at p. 670.)

Also, contrary to Goldfarb's contention that White's valuation was based on conjecture and insufficient considerations, her testimony indicates otherwise. She testified that she took into account Thompson's valuation, the general differences between preferred and common stock, the specific preferences afforded to preferred stock by Calgene, and the state of Calgene's business at time of the marriage.

Goldfarb in effect asks that we reweigh evidence that the court rejected. In adopting White's valuation and her emphasis on the fair market value statement in Calgene's prospectus, the court rejected Thompson's views of the problems with this valuation, and both his and Goldfarb's assertions that the stock option exercise prices were too low to reflect fair market value. Specifically, the court stated that it reviewed Thompson's rebuttal to White's report and that Thompson "did not deal with the apparent contradiction in Calgene's prospectus that stated that the exercise price must at least equal the fair market value of the stock as referenced by White. [Goldfarb] testified that the Board of Directors established the price arbitrarily low to reward employees, but, he also did not explain the obvious contradiction." The court's statements indicate that it did not find the testimony of Thompson and Goldfarb to be credible on the subject. Yelton points out that the trial court was not bound by their testimony, even if

24

uncontradicted.  We cannot credit it on appeal unless " 'in view of the whole record, it is clear, positive, and of such a nature that it cannot rationally be disbelieved.' "  (*Adoption of Arthur M.* (2007) 149 Cal.App.4th 704, 717).  The testimony is not of such a nature here.  We have no reason to disagree with the trial court's conclusion.

Goldfarb's argument is unpersuasive under our substantial evidence standard of review.  "Even in cases where the evidence is undisputed or uncontradicted, if two or more different inferences can reasonably be drawn from the evidence this court is without power to substitute its own inferences or deductions for those of the trier of fact, which must resolve such conflicting inferences in the absence of a rule of law specifying the inference to be drawn.  We must accept as true all evidence and all reasonable inferences from the evidence tending to establish the correctness of the trial court's findings and decision, resolving every conflict in favor of the judgment."  (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 631.)  "We may not reweigh the evidence . . . ."  (*Ghilotti Construction Co. v. City of Richmond* (1996) 45 Cal.App.4th 897, 903.)

Accordingly, we conclude that the trial court's valuation of Goldfarb's founder's stock at $0.39 a share at the time of marriage was supported by substantial evidence, and the trial court did not err.

## IV. *Goldfarb's Tracing Argument*

Goldfarb also argues that, assuming the proceeds from the sale of the Calgene stock are his separate property entirely, the court erred by not concluding that the tracing conducted by Thompson was sufficient to characterize the interests in the Farm Road and Wyndham real properties in dispute between the parties, and also in the parties' accounts. However, Goldfarb acknowledges this argument is conditioned on this court concluding that the trial court committed reversible error either in applying the *Pereira* apportionment method or in determining that Goldfarb's founder's shares had a fair market value of $0.39 at the time of marriage.  Because we have concluded the court did not err in either case, we do not need to further consider Goldfarb's tracing argument.

25

## V. *Goldfarb's Claims of Trial Court Accounting Errors*

Goldfarb also argues that the trial court made three accounting errors in Yelton's favor that require reversal.  We disagree.

## A. *College Savings Bank*

Goldfarb first argues that the trial court erred in denying his claim for reimbursement of $485,788 from an account that held the proceeds from Goldfarb's sale of College Savings Bank stock because its decision was based on an "erroneous premise."  Goldfarb does not establish error.

Goldfarb relies on certain differences between the court's decision, which relied on figures White stated in her May 2009 report and testimony, and figures contained in attachments to White's May 2009 report.  In her report, White stated that in December 1987, $851,000 was invested into College Savings Bank stock from the "ML 1994" account.  She further stated that, based on her tracing analysis, $741,263 of these funds should be characterized as Goldfarb's separate property and $109,738 should be characterized as community property.  White followed this conclusion with a reference to "Tab 8, Schedule 1" of her report.  This schedule states that the College Savings Bank stock was purchased with a total of $110,279.35 from the "ML 1994" account, of which $109,736.80 should be characterized as Goldfarb's separate property and $442.55 should be characterized as community property.

In her May 2009 report, White stated that this stock was sold in August 2002, and that the sales proceeds were $900,000, of which $783,945 should be characterized as Goldfarb's separate property and $116,055 should be characterized as community property.  Again, White referred to "Tab 8, Schedule 1" of her report, which states that the total amount of funds from the College Savings Bank stock was $897,389.22, of which $893,809.60 should be characterized as Goldfarb's separate property and $3,579.62 should be characterized as community property.  In her subsequent testimony, White confirmed that she characterized as Goldfarb's separate property $783,945 of the sales proceeds of the College Savings Bank stock.

26

In its statement of decision, the trial court repeated White's report statements characterizing both the source of funds used to purchase the College Savings Bank stock and the proceeds from its sale, except that the court stated White had found $714,263 of source funds should be characterized as Goldfarb's separate property, when White actually stated the amount as $741,263. In doing so, the court stated that White was "able to properly trace in Tab 8, schedule 1" the separate and community property nature of the source of the funds used to purchase the stock, and again referred to this schedule when repeating White's conclusions about the separate and community proper nature of the proceeds from the sale of the stock.

On appeal, Goldfarb notes the discrepancies between White's report, her schedule, and the court's statement of decision, and argues that they establish that the court made a serious accounting error to his disadvantage, since the schedule shows that almost all of the proceeds from the sale of the College Savings Bank stock should be characterized as Goldfarb's separate property, and Thompson's own report "explicates" Goldfarb's reimbursement claim.

We need not resolve this confusion of numbers because, ultimately, as Yelton also argues, the exact figures taken from White's report are not relevant because the court found that Goldfarb, via Thompson, did not provide a tracing of the relevant funds sufficient for the court to determine that he was entitled to the reimbursement. The court stated that "it is almost impossible from tab 53 [of Thompson's report] to determine if [Goldfarb] is entitled to any reimbursements because White determined that not all the sales proceeds were [Goldfarb's] separate property." The court found, first, that the total expenditures were almost $300,000 more than the $900,000 of proceeds from the College Bank Stock and "there is no tracing to show the source of the additional funds." Second, Goldfarb received, used, or received the benefit of 56 percent of all the expenditures, $669, 215. Third, Thompson made no effort to allocate between the separate and community sources in the account as determined by White. Fourth, the court concluded that, "even if someone performed a tracing using the correct timing methodology and assuming Thompson's allocations in tab 53 were uncontested, [Goldfarb's] maximum

27

reimbursement for his separate property College Bank funds would be approximately $114,730," but, the court found, Thompson's "tracing analysis does not do this."

The court did determine that Yelton would be charged $71,545 in the ultimate allocation of assets for money she borrowed from the account.

Goldfarb does not respond to the court's problems with Thompson's tracing analysis, and its conclusion that it made it almost impossible to determine if Goldfarb was entitled to any reimbursement, other than to contend that this does not make White's figures correct. This argument is unpersuasive. The court's statement of decision indicates that, regardless of its conclusions about the details of White's figures, it denied any further reimbursement request by Goldfarb regarding the account because Goldfarb had not proved he was entitled to anything further, regardless of how much or how little of separate and community funds were comingled in the account.

## B. *Elimar Stock Claim*

Goldfarb next argues that the trial court erroneously relied on a note in a schedule of White's report to assign Goldfarb a separate property interest of $31,132 in certain warrants held by Elimar (which had been formerly known as The Goldfarb Partnership), rather than the $109,370 to which he was entitled, since it was entirely separate property. According to Goldfarb, White's report incorrectly identified these warrants as part of Goldfarb's founder's stock, when Thompson reported these shares originated as warrants held by Elimar. Furthermore, he points out, White testified that she did not know whether or not this stock, purchased in March 1988, was purchased with Elimar warrants.

However, as Yelton points out, Goldfarb's argument contains a fatal flaw: he does not identify whether or not, or how, the trial court might have incorporated White's or Thompson's views of this 1988 stock purchase into its statement of decision. Indeed, Goldfarb does not cite to any portion of the statement of decision as being in error. We cannot determine the court's conclusion from Goldfarb's argument. In short, Goldfarb has not met his burden of affirmatively establishing error. (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.) The most fundamental principle of appellate review is that " '[a] judgment or order of the lower court is *presumed correct*. All intendments and

28

presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown.' " (*Ibid.*) Therefore, we reject Goldfarb's claim of error.

## C. *$30,000 Claim*

Goldfarb also argues that the trial court neglected to correct a purported $30,000 error in one of White's schedules that he raised in his objections to the court's proposed statement of decision. According to Goldfarb, White indicated $30,000 was transferred from community funds to Goldfarb's separate property account, when in fact Thompson's report established that the transfer was to a community account for community purposes. Furthermore, Goldfarb contends, "there was no evidence adduced that the account was used for [Goldfarb's] separate expenses, and no applicable presumption that would be true."

Goldfarb's $30,000 appellate claim contains the same fatal flaw as his Elimar stock claim, although Yelton does not raise the issue again. That is, Goldfarb does not cite to any portion of the statement of decision as being in error, and we cannot determine the court's conclusion on the issue from Goldfarb's argument. Once again, Goldfarb has not met his burden of affirmatively establishing error. (*Denham v. Superior Court*, *supra*, 2 Cal.3d at p. 564.) Therefore, we reject his claim of error.

## VI. *Yelton's Claim Regarding Spousal Support*

In her cross-appeal, Yelton argues the trial court's ruling regarding permanent spousal support must be reversed because the court did not consider the factors outlined in Family Code section 4320 in ruling on the matter and instead merely, and improperly, adopted a temporary spousal support order.[8] Goldfarb disagrees, and also argues that

---

[8] Family Code section 4320 states:

"In ordering spousal support under this part, the court shall consider all of the following circumstances:

"(a) The extent to which the earning capacity of each party is sufficient to maintain the standard of living established during the marriage, taking into account all of the following:

29

"(1)  The marketable skills of the supported party; the job market for those skills; the time and expenses required for the supported party to acquire the appropriate education or training to develop those skills; and the possible need for retraining or education to acquire other, more marketable skills or employment.

"(2)  The extent to which the supported party's present or future earning capacity is impaired by periods of unemployment that were incurred during the marriage to permit the supported party to devote time to domestic duties.

"(b)  The extent to which the supported party contributed to the attainment of an education, training, a career position, or a license by the supporting party.

"(c)  The ability of the supporting party to pay spousal support, taking into account the supporting party's earning capacity, earned and unearned income, assets, and standard of living.

"(d)  The needs of each party based on the standard of living established during the marriage.

"(e)  The obligations and assets, including the separate property, of each party.

"(f)  The duration of the marriage.

"(g)  The ability of the supported party to engage in gainful employment without unduly interfering with the interests of dependent children in the custody of the party.

"(h)  The age and health of the parties.

"(i)  Documented evidence of any history of domestic violence, as defined in Section 6211, between the parties, including, but not limited to, consideration of emotional distress resulting from domestic violence perpetrated against the supported party by the supporting party, and consideration of any history of violence against the supporting party by the supported party.

"(j)  The immediate and specific tax consequences to each party.

"(k)  The balance of the hardships to each party.

"(l)  The goal that the supported party shall be self-supporting within a reasonable period of time.  Except in the case of a marriage of long duration as described in Section 4336, a 'reasonable period of time' for purposes of this section generally shall be one-half the length of the marriage. However, nothing in this section is intended to limit the court's discretion to order support for a greater or lesser length of time, based on any of the other factors listed in this section, Section 4336, and the circumstances of the parties.

"(m)  The criminal conviction of an abusive spouse shall be considered in making a reduction or elimination of a spousal support award in accordance with Section 4324.5 or 4325.

"(n)  Any other factors the court determines are just and equitable."  (Fam. Code, § 4320.)

Yelton is estopped from making, and has waived, her appellate claim. We agree that Yelton is estopped from making her appellate claim because she invited the purported error she complains of on appeal. Therefore, we do not reach the merits of her claim.

## A. *Relevant Proceedings Below*

The record indicates that, in December 2007, the court issued a memorandum of tentative decision in which it awarded Yelton $0.00 in spousal support from January 1, 2008, until the time of trial.

The parties addressed the spousal support issue in their written closing arguments to the court following the initial end of trial in 2008 (the court later reopened evidence after appointing White). In his April 2008 written closing argument, Goldfarb discussed each of the circumstances outlined in Family Code section 4320 that the court should consider in ordering spousal support. He argued "[t]hat there should be no future spousal support obligation," spousal support should be set at zero, and the court should retain jurisdiction to consider either spouse's request for spousal support in the future.

In her May 2008 written closing argument, Yelton did not argue for spousal support. She did not discuss Family Code section 4320 or any of Goldfarb's arguments about the factors therein. Instead, she requested only that the trial court "retain jurisdiction over spousal support."

The court issued a judgment regarding child and spousal support in June 2008 that set spousal support at $0.00. The court stated, "Commencing April 1, 2007, there shall be no payments for spousal support to either party. Notwithstanding the court shall retain jurisdiction over the issue of spousal support for either party until the death of either party, the remarriage of either party or further court order."

In September 2008, the trial court held a hearing on a motion by Yelton to modify spousal support because of changed circumstances due to a disability that had reduced her income. The only material in the record regarding this motion is the September 2008 hearing transcript itself. After the matter was submitted, the court stated: "I'm treating the last hearing we had and the statement of decision that emanated from that—although I don't have the statement of decision in front of me, I know that the tentative decision was

31

pretty much incorporated in the statement of decision. That was dated December 18, 2007, I believe. [¶] So I'm treating that as the order from which they have sought modification, and that order was zero spousal support for the respondent . . . ."

After giving both parties a "*Gavron*" warning[9] and making a related reference to Family Code section 4320, the court modified spousal support based on the court's DissoMaster to award Yelton $1,700 per month through December 2008, ordered that this support terminate sooner if Yelton's disability terminated, and that otherwise spousal support would "revert" back to zero effective January 1, 2009.

On January 12, 2010, after White's reports and the reopening of evidence, the court issued a memorandum of tentative decision, in which it again addressed the issue of spousal support. The court stated, "Subsequent to trial [Yelton] filed a motion to modify temporary support. The order resulting from that hearing shall stay in place as ordered. The court considered all of the Family Code section 4320 factors at that time and determined that in this case it is appropriate to retain jurisdiction to award spousal support for either party until that party remarries, either party dies or further court order. It was intended that the current order would become the final judgment for spousal support."

In this January 2010 memorandum of tentative decision, the court also ordered Yelton to draft a proposed statement of decision. Subsequently, Yelton submitted a document entitled "Statement of Decision," in which she stated that "[Yelton] adopts the Memorandum of Tentative Decision issued on January 12, 2010, as the Statement of Decision" except for two issues unrelated to spousal support. At the same time, Yelton submitted to the court a proposed order, in which she repeated the court's ruling regarding spousal support in its memorandum of tentative decision, except that she deleted the court's reference to the Family Code section 4320 factors and to a final

---

[9] A "*Gavron*" warning, named after *In re Marriage of Gavron* (1988) 203 Cal.App.3d 705, 712 (*In re Marriage of Schmir* (2005) 134 Cal.App.4th 43, 46, fn. 3), "is a fair warning to the supported spouse he or she is expected to become self-supporting." (*Schmir*, at p. 55.)

32

judgment. Yelton stated in this document: "Subsequent to trial [Yelton] filed a motion to modify temporary support. The order resulting from that hearing shall stay in place as ordered. The court retains jurisdiction to award spousal support for either party until that party remarries, either party dies or further order of the court."

In its April 12, 2010 final statement of decision, the court repeated the substance of its memorandum of tentative decision ruling regarding spousal support, as proposed by Yelton, with only slight changes: "Subsequent to trial [Yelton] filed a motion to modify temporary support. That order shall stay in place as ordered. The court considered all of the Family Code section 4320 factors at that time and determines that in this case it is appropriate to retain jurisdiction to award spousal support for either party until that party remarries, dies or further court order. It was intended that the current order would become the final judgment for spousal support."

Finally, in the court's final judgment, which appears based significantly on Yelton's proposed order, the court stated: "Subsequent to trial, [Yelton] filed a motion to modify support. The order resulting from that hearing was intended to be the final judgment of support and shall stay in place as ordered. The court retains jurisdiction to award spousal support for either party until that party remarries, either party dies or further order of the court."

## B. *Analysis*

We conclude that, as Goldfarb argues, Yelton is estopped from pursuing her appellate claim regarding permanent spousal support because she invited any purported error.

Yelton does not cite to any place in the record where she requested that she be awarded any amount of permanent spousal support. We have found only her request in her 2008 closing argument that the trial court maintain jurisdiction over the issue, as Goldfarb also requested, her adoption of the trial court's tentative spousal support ruling as a part of her own proposed Statement of Decision, and her minimal proposed statement on the issue in her proposed order. Her proposed statement of decision included her adoption of the trial court's references to its prior spousal support order and

33

its consideration of the factors in Family Code section 4320, both of which are the center of Yelton's appellate claim; her proposed order, upon which the court relied for its final judgment, did not refer at all to Family Code section 4320.

As this court has previously indicated, " '[u]nder the doctrine of invited error, when a party by its own conduct induces the commission of error, it may not claim on appeal that the judgment should be reversed because of that error.' [Citation.] . . . [A]n appellant 'cannot complain of error [it] personally "invited." In other words, one whose conduct induces or invites the commission of error by the trial court is *estopped* from asserting it as a ground for reversal on appeal.' " (*Transport Ins. Co. v. TIG Ins. Co.* (2012) 202 Cal.App.4th 984, 1000.) Furthermore, "It would be anomalous to allow plaintiffs to base their appeal solely on the ground of the deficiency of an order which their counsel drafted." (*Hassan v. Ford Motor Co.* (1982) 32 Cal.3d 388, 420-421.)

Yelton, by expressly adopting the trial court's tentative spousal support ruling and proposing it be a part of the final statement of decision, invited the purported deficiencies she complains of on appeal. Her proposed order also contributed to any purported error. Therefore, she is estopped from asserting her appellate claim.

Yelton does not respond to Goldfarb's "invited error" argument. She does oppose Goldfarb's argument that she has also waived her appellate claim by not objecting to deficiencies in the trial court's statement of decision pursuant to Code of Civil Procedure sections 632 and 634. We need not and do not address this waiver argument in light of our conclusion that Yelton is estopped because of invited error.

We also do not address the merits of Yelton's appellate claim, except to note, without deciding the issue, that we have examined the cases she cites and not found in them the requirement that a trial court explicitly address each factor listed in Family Code section 4320 under the present circumstances.

## VII. *Yelton's Wyndham Claim*

In the proceedings below, Goldfarb sought a *Watts* reimbursement from Yelton for her separate use, after the parties' separation, of a community residential property known as "Wyndham." (See *In re Marriage of Watts* (1985) 171 Cal.App.3d 366.) The trial

34

court ruled the fair rental value of Wyndham during the period of Yelton's use was $8,722 per month based on testimony by Goldfarb, and that Yelton owed Goldfarb one-half of the total rental value of $627,984 for the period from September 2001 to August 2007.

Yelton argues that the trial court abused its discretion in determining the fair rental value of Wyndham was $8,722 per month because there was contrary testimony, also by Goldfarb, presented at trial that the fair market was as low as $5,000 per month, and the testimony by Goldfarb relied on by the court "was purely speculative and lacked foundation." As a result, "[t]here was no substantial evidence that the fair rental value was $8,722 per month." We disagree.

## A. *The Relevant Proceedings Below*

At trial, Goldfarb testified on two separate days about his opinion of the fair rental value of Wyndham. On the first day, he testified that a "fair estimate" of the fair rental value of Wyndham over the period of Yelton's separate use of it was $5,000 to $6,000 per month, "maybe up to $7,000." After the court indicated it was hearsay for him to refer to the estimate made by the parties' joint appraiser, James Tilly, and to discussions with a real estate agent, Goldfarb stated that he based this opinion on comparable rents that he was aware of, including his current apartment, which was 10 percent the size of Wyndham and renting for $2,100 per month, as well as "advertisements in newspapers."

Additionally, Thompson, Goldfarb's expert, opined in his report that the fair market rental value from September 1, 2001 through December 31, 2007 was $448,400, which included compounded interest at 10 percent per annum, which amounts to $5,894.74 over this 76-month period. In stating his opinion, Thompson referred to the court's appointment of Tilly as a joint expert to establish fair market rental rates for the Wyndham property. However, it is unclear how Thompson relied on such a report from

Tilly, if he relied on it at all, or whether he relied on anything else, in reaching his own conclusion.[10]

On his second day of testimony, Goldfarb testified that he had conducted his own research into the fair rental value of Wyndham during the period of Yelton's separate use. Based primarily on rental property listings on the Internet, he testified that he now thought the fair rental value of Wyndham was $8,722 to $10,000 per month.

Goldfarb testified about the details of his research. Although he did not find "any perfect apples-to-apples" comparisons, he found "some that were definitely relevant." He referred to five houses and four apartments and indicated that he classified them and Wyndham by city, type, number of bedrooms and bathrooms, square footage when available, and his subjective opinions of location, quality, and condition, based on photographs of the properties (when available) and listings, other than Wyndham. He also considered the change in market rental rates over the relevant period of time, based on his own tenancy in 2001 in a one-bedroom, one-bath apartment, for which he paid $2,775 per month. He determined that for such apartments, rental values had declined 28 percent from October 2001 to January 2008. Assuming a linear decline in rental values for the relevant time period, he applied a 14 percent increase to his calculation of a present rental value for Wyndham, which resulted in the amount of $8,722. His research and calculations were admitted into evidence.

In response to questions by the court, Goldfarb further testified that only one of the properties he had used for comparison with Wyndham was located in Portola Valley, the location of Wyndham, and that he had not considered the fact that Yelton was renting out a portion of Wyndham.

Goldfarb also testified that he applied an alternative valuation method based on a comparison to one of the other properties and real estate investment considerations and concluded that the fair rental value of Wyndham could be as high as $10,000 a month.

---

[10] The only appraisal report by Tilly cited to by either party in their discussion of Wyndham is Tilly's 2003 appraisal of Wyndham's overall market value, not its fair market rental value.

36

He based this alternative calculation on his experience investing four to six times in the real estate market, a real estate course he took at the Stanford Business School from a leading expert in the field of real estate investment, and his co-investment in two limited partnerships.

In its memorandum of tentative decision, the court ruled in relevant part: "[Goldfarb's] unrebutted testimony was that the fair rental value was in the range of $8,722 to 10,000 per month. [Yelton] offered no contrary testimony. The court finds that the fair rental value is $8,722 per month and the total for 72 months is $627,984 and [Yelton] owes [Goldfarb] one-half or, $313,992."

In her proposed statement of decision, Yelton requested that the trial court delete this section and replace it with the following: " 'The court previously requested a Tilly analysis that was provided to the court indicating that around 2001 the fair rental value of the family resident was $5,143.00 per month. This analysis was performed by an expert and was a far better measure of the accurate monthly rental value of the property than [Goldfarb's] submission of Craig's listings and other unreliable rental valuations that were disputed by [Yelton] during trial. The amount that should be charged to [Yelton] is a maximum of $185,148.00 for 72 months. This should be further reduced at the discretion of the court for several reasons including that at trial the record indicated that both parties had agreed that the family was to remain in the residence for the benefit of the children and their school. Otherwise, [Yelton] would have moved to a cheaper residence. [Yelton] was not living in the residence for 14 of the last 21 months and should not be charged *Watt's* [*sic*] credits for that 14-month time period.' " (Italics omitted.)

In her proposed order, Yelton requested that the court state that she owed Goldfarb "one-half or, $313,992" for his *Watts* claim, but added that "[a]lternatively, [Yelton] owes [Goldfarb] one-half, or $185,148.00" for his *Watts* claim.

The trial court denied Yelton's objection. In its final statement of decision, the court stated: "[Goldfarb's] unrebutted testimony was that the fair rental value was in the range of $8,722 to $10,000 per month. [Yelton] offered no contrary testimony. The

37

court finds that the fair rental value is $8,722 per month and the total for 72 months is $627,984 and [Yelton] owes [Goldfarb] one-half or, $313,992. . . . The court is aware of how the economy, especially real estate rental market, has changed recently and cannot be comfortable that the fair rental value for the residence has remained constant. Unless the parties agree otherwise in writing, after the residence is sold the parties shall contact the court to set a date for a hearing to determine the fair rental value. The parties shall be entitled to have experts testify as to the updated rental value and conduct discovery accordingly." The court's final judgment in substance repeated this ruling.

## B. *Analysis*

At the center of Yelton's appellate claim is her argument that the second day of Goldfarb's testimony, when he opined that the fair market rental value of Wyndham was $8,722 to $10,000 per month, was "speculative and inadmissible." Specifically, she argues that, although an owner of property is entitled to testify as to his opinion of the property's value, this testimony must nonetheless be based on reliable evidence pursuant to sections 813, 814, 816, and 822, subdivisions (a)(2) and (b); since Goldfarb's was not based on reliable, admissible evidence, it was not "substantial evidence of value." Therefore, she argues, the trial court's finding must be reversed and the matter remanded for further trial on the issue. We find her argument unpersuasive.

### 1. *Yelton's Inadmissibility Argument*

Goldfarb argues that Yelton has waived her claim that Goldfarb's testimony was inadmissible because she failed to object below on the grounds she now raises on appeal. We agree. Pursuant to section 353, we will not reverse a finding by reason of the erroneous admission of evidence unless "[t]here appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion," we determine the evidence should have been excluded on the ground stated, and the error complained of resulted in a miscarriage of justice. (Evid. Code, § 353, subds. (a), (b); *People v. Rundle* (2008) 43 Cal.4th 76, 116 [" 'An objection to evidence must generally be preserved by specific objection at the time the evidence is introduced; the opponent cannot make a

38

"placeholder" objection stating general or incorrect grounds (e.g., "relevance") and revise the objection later' "], disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

Yelton did not object to the admission of Goldfarb's testimony about his research on the basis of any of the sections she relies upon on appeal, any of the rules contained therein, any of the case law she cites, or any of the arguments contained in her briefing to us. Yelton argues she preserved her appellate claim based on her two objections below, but this is not the case. Each of her two objections was directed to particular testimony by Goldfarb. First, when Goldfarb was describing one of the other properties he considered, Yelton's counsel objected that his description was "worse than vague," which objection was sustained. Goldfarb continued to testify about the other properties, without objection to the admissibility of his testimony. Second, when Goldfarb was discussing his alternative valuation method, the court sustained Yelton's counsel's objection that Goldfarb's testimony about what an investor buying the property would do was speculative. The remainder of Goldfarb's testimony on this alternative method was admitted. Yelton's counsel also did not challenge the credibility of Goldfarb's conclusions in cross-examination. We agree with Goldfarb that Yelton is foreclosed from making her appellate claim about inadmissibility based on her lack of objection and failure to otherwise challenge the credibility of Goldfarb's conclusions below. (See *In re Marriage of Hargrave* (1985) 163 Cal.App.3d 346, 352 ["[h]aving refrained from testing the credibility of husband's opinion in the trial court, wife is foreclosed from challenging the admissibility thereof in this court"].)

Yelton also argues that it would have been futile to raise further objections because the court overruled two of her counsel's objections to other testimony by Goldfarb, one on the ground of vagueness and one that a question was leading. These objections have nothing to do with the substance of her appellate claim and, therefore, her futility argument is unpersuasive.

Yelton also points out that, when the trial court issued its memorandum of tentative decision, her counsel proposed that it delete a section in which the court relied

on Goldfarb's $8,722 valuation and replace it with the portion we have already quoted, which favored Yelton's view. According to Yelton, this proposed change amounted to a specification of a controverted issue pursuant to Code of Civil Procedure 634, thereby preserving her appellate claim that Goldfarb's testimony "was not based on any reliable, admissible evidence, and thus does not constitute substantial evidence of value." We do not agree. Her counsel's proposed change does not preserve her claim of inadmissibility, since inadmissibility was not a subject of it. Rather, the counsel's contention merely appears to be that the court, faced with conflicting evidence, should reject Goldfarb's contentions for Yelton's point of view. As Goldfarb points out, Yelton does not explain in her opening brief how the court's denial of Yelton's proposed change otherwise constituted an independent error by the court. Therefore, Yelton's argument is unpersuasive.

In short, we conclude that Yelton, by failing to first object to the trial court that Goldfarb's second day of testimony was inadmissible for the reasons stated in her appellate brief, has waived this claim, and her arguments related to it, on appeal. Therefore, we do not need to, and do not, further address the merits of her inadmissibility claim.

### 2. *Yelton's Substantial Evidence Argument*

As we have discussed, the trial court has broad discretion to determine the value of community assets and its determination will be upheld if supported by substantial evidence in the record. (*In re Marriage of Nichols, supra,* 27 Cal.App.4th at p. 670.) "All issues of credibility are for the trier of fact, and all conflicts in the evidence must be resolved in support of the judgment. [Citation] The trial court's judgment is presumed to be correct on appeal, and all intendments and presumptions are indulged in favor of its correctness." (*Ibid*.)

In her reply brief, Yelton argues that, "even in the absence of an objection, [Goldfarb's] testimony as to the rental listing was not substantial evidence of the fair rental value of [Wyndham]." She cites only one legal authority for this proposition, however, *Mears v. Mears* (1960) 180 Cal.App.2d 484 (*Mears*), disapproved on other

grounds in *See v. See* (1966) 64 Cal.2d 778, 785-786. *Mears* does not stand for this proposition. In that case, the trial court rendered an interlocutory judgment of divorce and awarded the parties certain items of community property. (*Mears*, at p. 491.) However, findings of fact and conclusions of law by the court were waived by the parties. (*Ibid.*) The plaintiff wife appealed several determinations by the trial court, including that the defendant husband was awarded the community property paint business as his sole and separate property, arguing that she should have been awarded one-half of the business as her share of community property. (*Id.* at pp. 496-497.)

The appellate court in *Mears* concluded there was an implied finding by the trial court that the paint business was community property. (*Mears*, *supra*, 180 Cal.App.2d at p. 505.) The appellate court then addressed what valuation to place on that community property because there was "nothing in said finding . . . to indicate what valuation the court placed on said business." (*Ibid.*) The court, after noting that an owner of a business may testify as to its value, discussed the competing evidence in the record. On the one hand, the defendant husband had testified that the business was worth $3,000; on the other hand, the wife had testified that her husband had once told her that he had been offered $7,500 for the business. (*Ibid.*) The court noted that the latter testimony was inadmissible "because evidence of offers to buy or sell property is improper." (*Ibid.*) The court then noted, however, that "the testimony was not objected to." (*Ibid.*) Nonetheless, it concluded, without citation to any legal authority or further explanation, "such testimony would not support an inference that the property was worth $7,500 as against the implied finding that it was worth $3,000 based on proper evidence in the record. Accordingly, the sum $3,000 must be credited to community." (*Ibid.*)

Yelton argues that, given the *Mears* court's determination that the wife's testimony about the one-time offer her husband told her about did not support an inference as to the business's valuation, Goldfarb's testimony cannot be considered substantial evidence. She does not explain further, but it appears from her arguments elsewhere in her briefing regarding inadmissibility that she considers Goldfarb's testimony about rental price listings in Internet advertisements to be the same as offers of

41

sale of property, which, she argues, are not admissible, similar to the offer discussed in *Mears.*

Yelton's argument is unpersuasive because the *Mears* case involved a circumstance different than that before us. The appellate court was faced with determining an implied finding of the valuation of a business by the trial court for which there was no indication, other than the competing evidence in the record. The appellate court did not determine that the wife's testimony, in the absence of an objection, could not be considered substantial evidence in support of an express finding by the trial court. It only indicated the wife's testimony could not support an implied finding *as against* the husband's own, proper testimony of the business's valuation. Such is not the case here, where the trial court made an express finding that the fair market rental value of Wyndham was $8,722 per month, plainly indicating that it found Goldfarb's testimony to this amount to be persuasive.

Presumably, Yelton would argue that *Mears* is directly analogous to the present circumstances because, as she argues elsewhere in her briefing, there was conflicting, admissible evidence to Goldfarb's $8,722 valuation, namely Goldfarb's own testimony on the first day that the fair market rental value was $5,000 to $6,000 per month, and perhaps up to $7,000 per month. However Goldfarb's testimony for his $5,000 to $7,000 valuation was based on two things, which were "comparable rents, including his own apartment, and advertisements in newspapers." We fail to see how Yelton can maintain that this testimony, which essentially referred to the same categories of information as those identified by Goldfarb in support of $8,722 valuation but contained no details whatsoever, was substantial evidence that the trial court should have relied on, while Goldfarb's second day of testimony was not. Yelton's argument cannot withstand this contradiction.

Yelton also argues regarding inadmissibility that Goldfarb's testimony regarding his $8,722 valuation relied on his own speculation about properties that were not comparable to Wyndham for various reasons, given that he never visited the properties, did not know their locations, and made subjective determinations about certain aspects of

42

these properties in comparing them to Wyndham. To the extent she intends these arguments as also a basis for contending that Goldfarb's testimony did not amount to substantial evidence, they are unpersuasive. As the parties acknowledge, pursuant to section 813, the owner of a property may testify as to his or her opinion about the value of that property. (§ 813, subd. (a)(2).) Furthermore, the court may consider other evidence to understand and weigh such testimony, which evidence is subject to impeachment and rebuttal. (§ 813, subd. (b).) In addition, "the value of property for which there is no relevant, comparable market may be determined by any method of valuation that is just and equitable." (Evid. Code, § 823.)

Goldfarb testified that he had been unable to find "any perfect apples-to-apples" comparisons, and presented those he found that were "definitely relevant." Yelton did not challenge these assertions at trial, and presents only unpersuasive speculation in her appellate briefing, without citation to anything in the record, that Goldfarb could have found comparables. We disregard her argument. (*Grant-Burton v. Covenant Care, Inc.* (2002) 99 Cal.App.4th 1361, 1379 [appellate court may disregard any factual contention not supported by proper citation to the record].) The basis for Goldfarb's valuation could properly be considered by the court pursuant to sections 813 and 823. Furthermore, Goldfarb supported his $8,722 valuation not with speculation, but with a presentation in which he documented specific rental listings for other properties in the general area, although not necessarily in the same town as Wyndham, and identified the assumptions he made regarding them. In short, Yelton fails to establish that Goldfarb's second day of testimony, even in the absence of an objection, did not constitute substantial evidence.

## DISPOSITION

The judgment is affirmed.  The parties are to bear their own costs of appeal.

_____
Lambden, J.

We concur:


_____
Kline, P.J.


_____
Haerle, J.

44